Filed 10/8/14  P. v. Morales CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EDWARD A. MORALES,<br><br>Defendant and Appellant. | B252023<br><br>(Los Angeles County<br>Super. Ct. No. YA068979) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Scott T. Millington, Judge.  Reversed.

Joseph F. Walsh, under appointment by the California Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, William H. Shin and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Edward A. Morales appeals the judgment following his conviction for first degree murder with enhancements. We reverse his conviction pursuant to *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), in which our Supreme Court held "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine." (*Id.* at pp. 158-159.) On remand, the People may either accept a reduction of appellant's conviction to second degree murder or retry the first degree murder charge under a direct aiding and abetting theory. (*Id.* at p. 168.) We reject appellant's other challenges to the judgment.

## PROCEDURAL HISTORY

Appellant was charged with murder (Pen. Code, § 187, subd. (a)),[1] along with gang and firearm enhancements (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b)-(e)(1)). His first jury trial ended in a mistrial. After a second trial, a jury convicted him of first degree murder and found both enhancements true. The trial court denied a motion for a new trial and sentenced appellant to a total prison term of 50 years to life, consisting of 25 years to life on the first degree murder count and 25 years to life for the firearm enhancement. The court imposed various fines, fees, and credits not at issue here. Appellant timely appealed.

## STATEMENT OF FACTS

On June 3, 2004, Genaro Pastore, Jr. (Pastore, Jr.), was shot and killed outside his home on 106th Street in Inglewood, California. At the time, Pastore, Jr.'s father, Genaro Pastore, Sr. (Pastore, Sr.), was inside the house when he heard Pastore, Jr., arguing with someone and then heard three gunshots.[2] He ran outside and saw Pastore, Jr., holding his head with his hands. Pastore, Jr., told him, "Dad, they shot me." Pastore, Sr., saw a fair-skinned Hispanic male run toward a blue 1980 or 1985 Honda. The man got into the car and drove off. Pastore, Sr., later told Detective Kevin Lane that the blue Honda was a

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

[2]     An autopsy did not reveal any indication, such as injuries to his hands, that Pastore, Jr., had been in a physical fight.

mid-1980's model with a modified exhaust and he saw the suspect enter the passenger side of the vehicle.

Inglewood police officers recovered three expended bullet casings and one expended bullet from the scene.

Israel Hernandez, a neighbor, heard gunshots and ran out of his house. He saw a Hispanic male enter the passenger side of a blue car as it drove away. He described the car as a blue late 1980's-model Honda Civic hatchback. He described the man as a dark-skinned Hispanic, approximately five feet eight inches tall, 170 pounds with a fuzzy bald head and wearing a white T-shirt.

Hernandez eventually met with Detective Lane. Hernandez told him he did not get a good look at the suspect—he only saw the back of his head and a partial profile as he was walking away. Detective Lane showed him three photographic lineups. In one lineup, Hernandez identified an Inglewood 13 gang member named Raul Guillen, but he was only 10 percent sure. In another, he identified an Inglewood 13 gang member named Jiminez, but again he was only 10 percent sure. He thought Jiminez and Guillen were the same person. Detective Lane later determined Jiminez was in custody at the time of the murder. In the third lineup, which included an Inglewood 13 gang member named Giovanni Arias, Hernandez was unable to identify anyone. Appellant was an Inglewood 13 gang member at the time of the shooting.

The gun used in Pastore, Jr.'s shooting was eventually recovered following a police pursuit on August 21, 2004. That day, Inglewood police officers saw a Hispanic male, later identified as Arias, walk into a driveway of a 7-Eleven store. When Arias saw the police, he grabbed his waistband and fled to appellant's blue Honda Civic. He entered the passenger side and the car pulled away. Police pursued the vehicle. During the chase, the front passenger threw two guns out of the car. The car hit a barricade, and the three to five Hispanic males inside the car fled. Police caught and arrested Arias. Officers located the discarded guns; testing showed one was used in Pastore, Jr.'s murder.

The day after the pursuit, August 22, 2004, appellant reported to the San Diego police department that his car had been stolen sometime between August 21 and August 22, 2004.

Appellant was arrested approximately three years later on August 1, 2007. Detective Lane interviewed him; a recording of the interview was played for the jury and a transcript was admitted as an exhibit. During the interview, appellant and Detective Lane discussed Arias and Guillen. They also discussed two letters written from jail that were recovered from Arias's home. The letters had been shredded, but law enforcement had been able to piece them back together.

When asked about Pastore, Jr.'s murder, appellant initially denied knowing anything about it. He admitted in 2003 and 2004 he was a member of the Dukes clique of the Inglewood 13 gang and known as "Hoodlum." He also admitted he had been arrested in 2003 with Arias and Guillen when the three of them were in a car that also contained weapons.

Detective Lane asked what happened on the day of Pastore, Jr.'s murder, and appellant responded that Arias exited the passenger door of his car and shot Pastore, Jr. Appellant said they were driving around the neighborhood for 10 minutes "looking for trouble," then Arias said, "There's one right there"—meaning a rival 18th Street gang member—and he jumped out. Appellant saw Arias walk toward the victim and heard shots, but did not see the shooting itself. Appellant waited for Arias, and when Arias returned in about 30 seconds, he appeared "panicked." Appellant then drove him to Los Angeles because Arias did not want to return home. Appellant denied he implicated Arias because Arias had already been convicted of another murder.

Appellant said Arias was "crazy." He knew Arias was "going to go look for trouble," which appellant understood to mean he was going to rob someone. Appellant saw Arias had a gun when Arias exited his car and appellant knew he had it because "he sleeps with it; he walks around with it." Appellant denied knowing Arias was going to kill someone; he thought Arias would either rob or "check" the victim by claiming he was from Inglewood. Nonetheless, appellant knew if the victim said the wrong thing,

4

Arias was "going to pull out his gun and shoot" and run back to appellant. He said "everywhere [Arias] goes he looks for trouble" and he described Arias like "those movies where people have like three guns on them, that's the type of person he is."

Appellant admitted he was driving during the August 2004 police pursuit. He denied touching the guns or throwing them out of the car. He later reported the car stolen because he "didn't want nothing [*sic*] to do with it." He said if the male Arias had approached before the pursuit would have said the wrong neighborhood, something would have happened because "[t]hat's the way [Arias] thinks."

Detective Lane asked appellant about the two letters found at Arias's house. One was from Juan Cobian, with the moniker "Criminal," who wrote, "For Hoodlum, To Edward, how come you haven't been calling me? Oh, yeah, by the way, I heard you guys are putting 18th Streets on their back. That's firme."[3] (*Sic*.) In the second letter, an Inglewood 13 gang member wrote, "[Y]ou're the quarterback now," and if someone named "Boogie" was not "putting in . . . work," appellant should "handle him."

Over objection, the prosecution offered evidence that, on May 3, 2003, Inglewood police officers stopped a vehicle occupied by three male Hispanics, who turned out to be appellant, Arias, and Guillen. They were arrested and two handguns were recovered from the vehicle, neither of which was the murder weapon in this case.

Inglewood Police Detective Daniel Milchovich testified as an expert on the Inglewood 13 gang. He described the gang's history and background, as well as its hand signals, tattoos, graffiti, and cliques. He described the area within the City of Inglewood claimed by the gang. He identified the gang's primary activities as felony vandalism, weapons violations, narcotics sales, robbery, assault, shootings, and murder. He described prior convictions of gang members for murder, attempted murder, and shooting at an inhabited dwelling. He also described the hierarchy of the gang, with "shot callers" who had a lot of influence, and active gang members who would commit crimes for the

---

**3** "Firme" in English means "solid" or "good."

gang, which is also known as "putting in work." A "wannabe" was not a gang member but someone who hung out with the gang.

Detective Milchovich testified a violent rivalry existed between Inglewood 13 and the 106th Street clique of the 18th Street gang in 2004, which included shootings and murders. At the time it would have been dangerous for Inglewood 13 gang members to drive through the 106th Street area where the shooting occurred. Pastore, Jr.'s murder took place in an area claimed by the 106th Street clique.

Detective Milchovich identified Arias and Guillen as members of Inglewood 13. Arias was known as "Magoo" and Guillen was known as "Baby Shady." He reviewed the letters recovered from Arias's home and reconstructed by law enforcement. In one to Arias, an Inglewood 13 gang member praised Arias for feuding with the 18th Street gang. That letter also mentioned "Hoodlum," i.e., appellant, which Detective Milchovich interpreted to mean appellant and Arias were friends. The second letter was from an Inglewood 13 gang member to appellant by way of Arias, which showed appellant and Arias had a close relationship.

Detective Milchovich opined appellant was also a member of Inglewood 13. He believed appellant had influence in the gang based on a letter to appellant from another Inglewood 13 gang member, in which the gang member referred in code to appellant being trustworthy and influential.

Detective Milchovich also explained the importance of respect in gang culture, which is gained by committing crimes, including the ultimate act of murdering a rival gang member on that member's territory. Driving into a rival gang's territory was dangerous, and it would usually be done by gang members collectively. The advantages of acting with other gang members include increasing the chance of winning a confrontation and having other members vouch for what occurred.

When given a hypothetical situation mirroring the evidence in this case, Detective Milchovich opined the two Inglewood 13 gang members involved in the shooting would have been in rival gang territory to find a rival gang member, and they likely mistook the victim for an 18th Street gang member. He testified the driver would have been aware

6

the shooter had a gun because there is an "unwritten rule" that the gang members in the same car need to be aware of a gun in case they are on parole or probation or have a lengthy criminal history. Detective Milchovich also opined the driver in the hypothetical would have knowingly aided the shooter in the crime. He also testified the crime benefitted the gang.

When given a slightly varied hypothetical in which the driver of the car later told the police he did not know his fellow gang member was going to shoot anyone, Detective Milchovich opined that the shooting was foreseeable because, under the circumstances, this type of confrontation often leads to violence, including shootings, stabbings, and murder and the driver and the shooter had a close relationship. He believed the driver's claim to the contrary would not be reasonable.

Detective Lane also gave gang expert testimony. Based on a hypothetical mirroring the evidence in this case, he opined the driver's claim he did not know the shooter was going to shoot someone was not reasonable, the shooter would not have kept the driver in the dark about having a gun or planning to shoot someone, and the likelihood that a shooting would occur was "very, very high."

Appellant presented no affirmative evidence in his defense.

## DISCUSSION

### 1. Chiu *and First Degree Murder*

After appellant was convicted and sentenced in this case, the California Supreme Court decided *Chiu*, concluding "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Chiu, supra*, 59 Cal.4th at pp. 158-159.)[4] Here, the jury was instructed on both theories. Appellant argues the jury instruction on natural and probable

---

[4]    The Attorney General has not argued we should not apply *Chiu* because it was decided after the judgment in this case. (*People v. Carter* (2005) 36 Cal.4th 1114, 1144 [judicial decisions are generally fully retroactive].)

7

consequences was erroneous under *Chiu.* The Attorney General concedes this error. In light of *Chiu*, we agree the instruction was erroneous. The Attorney General contends, however, that the error was harmless, citing the strength of the evidence of appellant's direct aiding and abetting liability. But regardless of the evidence of direct aiding and abetting, the trial court effectively removed that theory from the jury in response to a jury question, so the jury's verdict must have rested on the natural and probable consequences doctrine. Therefore, we find the error prejudicial.

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu, supra*, 59 Cal.4th at p. 167.) In this case, that means appellant's "first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that [appellant] directly aided and abetted the premeditated murder." (*Ibid.*)

In this case, the jury was instructed that appellant could be found guilty of first degree premeditated murder if he directly aided and abetted murder (CALCRIM No. 401) or if he aided and abetted the target crimes of attempted robbery or breach of the peace and the natural and probable consequences of those crimes was murder (CALCRIM No. 403). The jury was further instructed that, in order to find appellant guilty of first degree murder, it must find appellant acted willfully, deliberately, and with premeditation (CALCRIM No. 521). During deliberations, the jury sent a note asking, "[I]f considering first degree murder, do we consider whether [appellant] or whether the shooter acted 'willfully, deliberately, and with premeditation'?" After conferring with counsel, the court responded, "The answer to your question is the shooter."

The court's response to the jury's question eliminated the possibility of convicting appellant of first degree murder based on direct aiding and abetting principles. To convict a defendant of first degree murder as a direct aider and abettor, the jury had to find appellant *himself* acted willfully, deliberately, and with premeditation. (*Chiu, supra*, 59 Cal.4th at p. 167 ["An aider and abettor who knowingly and intentionally assists a

8

confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder."]; *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 [explaining murder conviction based on direct aiding and abetting requires "that the aider and abettor must know and share the murderous intent of the actual perpetrator"].) By contrast, under the natural and probable consequences doctrine a jury need not find a defendant personally acted willfully, deliberately, and with premeditation because that doctrine "'imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.'" (*Chiu, supra*, at p. 165.)

The jury's question was phrased in the disjunctive—whether it had to find appellant *or* the shooter acted willfully, deliberately, and with premeditation in order to convict him for first degree murder. But a first degree murder conviction was not an either/or proposition in this case. The court should have carefully explained to the jury it had to consider *appellant's* mental state for a conviction based on a direct aiding and abetting theory and the *shooter's* mental state for a conviction based on the natural and probable consequences doctrine. By responding that the jury had to find the shooter harbored the intent necessary for first degree murder, the court in effect directed the jury not to consider appellant's own mental state, which eliminated the possibility of convicting him of first degree murder as a direct aider and abettor. The jury therefore must have relied on the natural and probable consequences doctrine and we cannot conclude beyond a reasonable doubt the jury relied on a legally valid theory to convict appellant.

## 2. *Appellant's Remaining Contentions*

Appellant raises a host of other challenges to his conviction. In light of our reversal of his first degree murder conviction, we need not address his argument that

insufficient evidence supported his first degree murder conviction because his argument was confined to whether *Arias* committed the murder with premeditation and deliberation, which will not be an issue on remand. We find his other claims lack merit.

A. *Evidence Undermining Appellant's Confession*

Appellant contends the trial court erred and therefore violated his constitutional right to present a defense by excluding evidence that Arias had not been arrested for Pastore, Jr.'s murder while Guillen had been arrested for the murder, and evidence that a deceased witness had identified Guillen as the shooter. He believed this evidence would have supported his defense that his confession to Detective Lane was false. We review the trial court's exclusion of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717 (*Waidla*).) We find no such abuse here.

Before trial, the prosecution moved to exclude evidence of what happened to Arias and Guillen after the murder. Appellant opposed, arguing the evidence that Detective Lane arrested Guillen and did not arrest Arias was admissible to show Detective Lane did not believe appellant's confession. The court found Detective Lane's belief was irrelevant and noted the jury was not permitted to speculate on whether anyone else has been or would be prosecuted, citing CALCRIM No. 373.[5] Later, defense counsel raised the issue again, noting Guillen had been arrested for the murder, but Arias had not, even though appellant had named Arias as the shooter. The prosecutor explained Arias had not been prosecuted because the only evidence against him was appellant's inadmissible statement. She also explained Detective Lane had presented Guillen's case to the district attorney, but the case was rejected. The court maintained its prior ruling that appellant could not ask Detective Lane his belief about appellant's confession and could not

---

**5** CALCRIM No. 373 states: "The evidence shows that (another person/other persons) may have been involved in the commission of the crime[s] charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether (that other person has/those other persons have) been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crime[s] charged."

10

introduce evidence of any arrest or nonarrest of Arias and Guillen, again citing CALCRIM No. 373. The court did allow appellant to introduce any other evidence that Arias was not the shooter, such as the identification of Israel Hernandez.

Later during trial, the court precluded defense counsel from questioning Detective Lane about a deceased witness's identification of Guillen because it was hearsay and unduly prejudicial.

After the close of evidence, the court instructed the jury with CALCRIM No. 373.

"Evidence is relevant if it has any tendency in reason to prove a disputed material fact. (Evid. Code, § 210.)" (*Waidla, supra*, 22 Cal.4th at p. 718.) Here, evidence that Guillen had been arrested and Arias had not been arrested had no logical connection to the veracity of appellant's confession. As the prosecutor pointed out, Arias was not arrested because the only evidence against him was appellant's inadmissible statement and Guillen was arrested but the district attorney refused to prosecute him. Those reasons had nothing to do with whether appellant was lying about Arias being the shooter. And even if those were not the reasons for the arrest and prosecution decisions regarding Arias and Guillen, there could have been myriad reasons why those individuals were or were not arrested and prosecuted that would have had little bearing on the truth of appellant's claim that Arias was the shooter. Further, as the trial court recognized, introducing this evidence would have directly conflicted with CALCRIM No. 373, which was designed to "'discourage the jury from irrelevant speculation about the prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the perpetration of the charged offenses, and also to discourage speculation about the eventual fates of unjoined perpetrators.'" (*People v. Brown* (2003) 31 Cal.4th 518, 561 (*Brown*).)

Appellant relies heavily on *People v. Holloway* (2004) 33 Cal.4th 96, but we fail to see its relevance. In that case, the Supreme Court found the defendant had forfeited an argument that the trial court improperly instructed the jury that it could use evidence of one victim's sexual orientation only for limited purposes. (*Id*. at p. 133.) On the merits, the court found no abuse of discretion in giving the limiting instruction because it

11

protected against the jury misusing the evidence as improper evidence of the victim's character. (*Id.* at pp. 133-134.) Neither of these points speaks to whether the trial court here abused its discretion in excluding evidence of whether Guillen and Arias had been arrested for Pastore, Jr.'s shooting.

Appellant also argues the trial court erred in excluding the deceased eyewitness's identification of Guillen as the shooter as hearsay because he offered it for the nonhearsay purpose of showing his confession identifying Arias as the shooter was false.[6] But this purpose plainly turns on the truth of the witness's identification. The identification of Guillen would have only been useful to appellant's defense if it were true, thereby undermining the truth of appellant's confession that Arias was the shooter. Thus, the trial court did not abuse its discretion in excluding the deceased witness's identification as inadmissible hearsay.

Finally, we reject appellant's argument his constitutional right to present a defense was violated because, "'[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense.'" (*People v. Robinson* (2005) 37 Cal.4th 592, 626-627 (*Robinson*).)

## B. *Evidence of Detective Lane's Prior Misconduct*

Appellant claims he was denied his rights to present a defense and to a fair trial when the trial court limited evidence that Detective Lane lied during an internal affairs investigation and was demoted and suspended as a result. Prior to the first trial, the prosecution filed a motion to disclose Detective Lane's personnel records, in light of a 2001 arbitrator's opinion and award that had been uncovered. In the opinion, the arbitrator found the City of Inglewood had just cause to reassign Detective Lane from the Gang Intelligence Unit to the Patrol Division due to Detective Lane's misconduct in the arrest and booking of a suspect. The arbitrator noted Detective Lane had not contested a five-day suspension and had stipulated to violating department rules. According to the

---

[6] Because we reject appellant's contention on the merits, we assume appellant properly raised it in the trial court.

12

opinion, Detective Lane's discipline arose from a December 27, 2000 robbery, to which Detective Lane and other officers responded. A suspect named Aimes was arrested and Detective Lane performed a patdown search of him for weapons. Aimes told Detective Lane he had come to the barbershop where the robbery took place to buy marijuana and the owner pulled a gun on him. Officer Gallatin then transported Aimes to the police station, where Officer Chism[7] searched him and removed a bag of marijuana from his pocket. Officer Chism told Detective Lane and Officer Gallatin he had found marijuana and asked, "What do you want me to do with it? Do you want me to get rid of it?" Detective Lane replied, "As far as I'm concerned, it does not exist." Officer Gallatin said, "You have to talk to the arresting officer." Officer Chism destroyed the marijuana.

Thereafter, a robbery detective named Barrow interviewed Aimes, who said he had marijuana in his pocket when he was arrested. Detective Barrow asked Detective Lane if Aimes had marijuana on him and Detective Lane said he did not see any marijuana. When Detective Barrow spoke with Officer Chism, however, Officer Chism said Detective Lane and Officer Gallatin told him to get rid of the marijuana found on Aimes.

An internal investigation was conducted, and Detective Lane was interviewed twice. In his first interview, he denied knowing anything about the marijuana. During his second interview, he admitted knowing about the marijuana but said, "As far as I'm concerned, it doesn't exist," because he was not the handling officer, he did not want to know what Officer Chism did with it, and if called as a witness in an internal investigation, he could honestly say he did not know if it was destroyed. He admitted he did not tell Detective Barrow he knew the marijuana existed even though he knew Detective Barrow was trying to determine why the police report on the incident did not mention marijuana. Detective Lane said he understood under Department policy the marijuana should have been booked as evidence.

---

[7]     The arbitration opinion does not give first names for Officers Gallatin and Chism.

13

The police department concluded the words Detective Lane used with Officer Chism "seriously eroded his credibility" and he "vacillated on stating the facts and manipulated circumstances to avoid taking responsibility, which was deplorable."

During the first trial the court held a hearing and conducted an in camera review of Detective Lane's personnel file. In open court, the court allowed appellant to join the prosecution's motion to disclose potential information in Detective Lane's personnel file and ordered "certain information" be disclosed to both the prosecution and the defense. Appellant moved for a mistrial. The prosecutor responded in part that the information was not material because Detective Lane's interview with appellant was recorded and Detective Lane's trial testimony was primarily based on that interview. The court declared a mistrial because further investigation into the arbitrator's opinion was necessary and it would unduly delay the trial. The court did not address whether the information was material to Detective Lane's testimony.

During the second trial, the court held an Evidence Code section 402 hearing on the issues surrounding Detective Lane's prior misconduct (hereafter the 2000 misconduct). Appellant argued the 2000 misconduct should be admitted because it was not too remote from the 2004 shooting, it involved moral turpitude, and it was relevant to Detective Lane's credibility. The prosecutor responded the main evidence in the case was appellant's video-recorded interview, not Detective Lane's credibility, although she conceded the 2000 misconduct constituted moral turpitude and was relevant to Detective Lane's credibility. She argued any probative value was outweighed by undue consumption of time because if the 2000 misconduct was admitted, the prosecution should be given the opportunity to introduce evidence of Detective Lane's distinguished career since that time. She also believed the jury would be unduly confused by a "trial within a trial" to determine what happened during the 2000 misconduct and whether Detective Lane was credible. Defense counsel responded he did not intend to go "deep into the facts" of the 2000 misconduct, but contended the evidence was relevant to whether Detective Lane was "the kind of detective that might be willing to fudge it, hide

14

evidence, do something that would be contrary to his position as an officer and a trusted member of the Inglewood Police Department."

The court initially excluded the 2000 misconduct. While the court felt the conduct was "egregious," it concluded its probative value was low because appellant's video-recorded interview "sort of speaks for itself" and it would take up an undue amount of time. If appellant could establish some "nexus" between Detective Lane's testimony and the 2000 misconduct, the court was willing to revisit the ruling.

After hearing some of Detective Lane's trial testimony, the trial court viewed Detective Lane as an "integral part of this case" and ruled some of the evidence of the 2000 misconduct was admissible, namely Detective Lane's statements in response to Officer Chism's question regarding what to do with the marijuana found on Aimes. Appellant urged the court to also admit the evidence that Detective Lane falsely denied knowing anything about the marijuana at his first interview during the internal investigation. The court excluded that additional evidence, finding it went "too far field" under Evidence Code section 352.

On cross-examination, Detective Lane admitted Officer Chism approached him and Officer Gallatin and told them he found marijuana on Aimes. He clarified, however, that Officer Chism asked Officer Gallatin directly, "What should I do with it?," and only then did Officer Gallatin ask him, "What should he do with it?" Detective Lane responded, "As far as I'm concerned, it doesn't exist." Appellant's counsel asked him, "So as far as you were concerned, evidence that might have benefited the defense or the defendant in this case, as far as you were concerned after being told about it, it didn't exist to you, right?" He responded, "I didn't know it was evidence." During this testimony, the court sustained objections to questions about whether Detective Lane was demoted or suspended for the 2000 misconduct.

On redirect examination, Detective Lane explained when he said, "As far as I'm concerned, it doesn't exist," he meant the disposition of evidence was not his responsibility because he was not the arresting officer in the case. On recross-examination, he denied he was telling Officer Chism to destroy evidence. At the time of

15

the 2000 incident, Detective Lane was the highest ranking officer among the three officers involved.

After the verdict, appellant moved for a new trial, arguing the court erred by excluding Detective Lane's "cover up" of the 2000 misconduct. The court denied the motion, noting it had "balanced [the evidence] completely under 352 with regards to the probative value and prejudicial impact as well as the undue consumption of time" and gave appellant "ample opportunity to impeach Detective Lane with that evidence."

Appellant now claims the trial court erred and violated his constitutional rights[8] in excluding evidence that Detective Lane lied to Detective Barrow during the robbery investigation, lied during the internal investigation of the 2000 misconduct, and was demoted and suspended as a result of the 2000 misconduct. Past conduct involving dishonesty or moral turpitude is relevant to a witness's honesty and veracity, but its admission is subject to the trial court's balancing under Evidence Code section 352. (*Robinson, supra*, 37 Cal.4th at p. 626; *People v. Wheeler* (1992) 4 Cal.4th 284, 295-296.) We review the trial court's ruling for abuse of discretion. (*Robinson, supra*, at p. 626.)

While the trial court acted within its discretion in excluding evidence of Detective Lane's demotion and suspension, the trial court abused its discretion in excluding evidence that Detective Lane lied to Detective Barrow and lied during the internal investigation of his 2000 misconduct. The trial court was certainly correct that Detective Lane's conduct during the investigation was "egregious." But the trial court improperly discounted the value of that evidence, which was even more probative of Detective Lane's credibility than his suggestion to another officer to destroy evidence. Moreover, while the jury viewed Detective Lane's video-recorded interview with appellant, doing so did not completely eliminate Detective Lane's credibility as an issue, given he was the

---

**8** Appellant raised no constitutional objections to the exclusion of the 2000 misconduct in the trial court, but we find no forfeiture because he does not "'invoke facts or legal standards different from those the trial court itself was asked to apply.'" (*People v. Redd* (2010) 48 Cal.4th 691, 730, fn. 19.)

investigating officer and a primary prosecution witness. There was also no indication this limited additional evidence would have caused a significant consumption of jury time or would have unduly confused the jury.

The error was harmless, however, under either *People v. Watson* (1956) 46 Cal.2d 818, 836 (reasonable probability of harm) or *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt) because significant evidence strongly demonstrated appellant's guilt independent of Detective Lane's credibility. As noted, the jury viewed appellant's video-recorded interview, during which appellant incriminated himself with several critical admissions about his role in the shooting and his knowledge of Arias's intent as they drove through a rival gang's territory. Moreover, officers recovered the gun used in Pastore, Jr.'s murder only a month after the shooting when it was tossed from appellant's car. Appellant then reported his car stolen the next day, suggesting a consciousness of guilt. And the gang evidence showed appellant and Arias were fellow gang members with a close relationship and Arias had a motive to kill someone he believed was a rival gang member in the rival gang's territory.[9] Thus, reversal is not warranted.

## C. *Evidence of Appellant's May 2003 Arrest*

Appellant argues the trial court erred in admitting evidence of his May 2003 arrest. We review the court's ruling for abuse of discretion (*People v. Foster* (2010) 50 Cal.4th 1301, 1328 (*Foster*)) and find none.

Before trial, the prosecution moved to introduce evidence of appellant's May 2003 arrest, arguing it was relevant to the gang allegation and to show appellant's knowledge and lack of mistake under Evidence Code section 1101, subdivision (b), specifically that appellant knew Arias was carrying a gun at the time of Pastore, Jr.'s shooting and would likely shoot him. Appellant objected, arguing the probative value of the evidence was

---

[9] To the extent the excluded evidence of Detective Lane's 2000 misconduct would have undermined Detective Lane's testimony as a gang expert, any error was harmless because he essentially gave the same opinions as Detective Milchovich.

outweighed by its prejudicial effect because the guns found in the car were not used in Pastore, Jr.'s shooting, appellant was never charged after the arrest, neither Guillen nor Arias were charged as defendants in the instant case, and the arrest did not tend to show whether appellant's confession in this case was accurate. The prosecutor explained charges were not filed against appellant because there was insufficient evidence, but she believed charges were filed against Guillen and Arias. Appellant claimed that fact bolstered his argument that evidence of appellant's arrest was more prejudicial than probative.

The court recognized case law holding it would be erroneous to admit evidence that a defendant possessed other weapons to show the defendant is the kind of person who carries such weapons. But the court distinguished that situation and found the evidence relevant under Evidence Code section 1101, subdivision (b) for appellant's knowledge. The court also weighed the evidence under Evidence Code section 352 and found it "very probative" of whether appellant knew Arias had a gun at the time of the shooting and would shoot Pastore, Jr., which was relevant to the natural and probable consequences theory of aiding and abetting. The court allowed its admission for the limited purpose of knowledge and of gang association.

Appellant thereafter argued the arrest report did not indicate who had actually possessed the guns found in the car. The court noted appellant stated in his interview with Detective Lane that he "always knew that Mr. Arias was carrying guns." Appellant responded that the evidence of his arrest for the purpose of his knowledge was therefore cumulative of that statement. The court noted the standard of proof under Evidence Code section 1101, subdivision (b) was only preponderance of the evidence and overruled the objections.

At trial, the prosecutor elicited testimony that on May 3, 2003, Inglewood police officers stopped a vehicle occupied by appellant, Arias, and Guillen. They were arrested, and two handguns were recovered from the vehicle.

In her closing argument, the prosecutor cited the arrest as proof of appellant's close relationship with Arias and as proof of a pattern of conduct by appellant and Arias.

18

The trial court instructed the jury on generally considering evidence for a limited purpose and specifically that, if the jury found appellant committed the uncharged May 2003 offense by a preponderance of the evidence, it could only consider it in deciding whether or not "[t]he defendant knew of Giovani Arias'[s] propensity to carry firearms; [¶] [t]he defendant's alleged actions were the result of mistake; [¶] [t]he defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crime and enhancements charged; [¶] AND/OR [¶] [t]he defendant had a motive to commit the crime charged." The jury was told not to consider the evidence for any other purpose and not to conclude from the evidence that appellant had a bad character or was disposed to commit crime. It was also told it could only consider the May 2003 arrest as "one factor" along with other evidence and could not find it sufficient alone to convict appellant.

Following trial, appellant again raised his objections to the introduction of evidence of his May 2003 arrest in conjunction with his new trial motion. The court again rejected the contention, finding the evidence "highly probative" of appellant's knowledge of what Arias might do at the time of the shooting.

Like the trial court, the parties on appeal correctly recognize "it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056, and cases cited therein.) But evidence of the presence of a gun on another occasion may be admissible for other purposes under Evidence Code section 1101, subdivision (b). (See *People v. Smith* (2003) 30 Cal.4th 581, 613-614 [allowing introduction of evidence a gun and ammunition not used in murder but found at defendant's house because it was relevant to defendant's state of mind].) One such ground in Evidence Code section 1101, subdivision (b) is knowledge,[10] and here, there is no doubt the presence of guns in the car

---

[10] Evidence Code section 1101, subdivision (a) makes inadmissible "evidence of a person's character or a trait of his or her character (whether in the form of an opinion,

19

with appellant, Arias, and Guillen at appellant's May 2003 arrest was highly probative of appellant's knowledge Arias possessed a gun at the time of Pastore, Jr.'s shooting and would likely shoot someone. That knowledge in turn was relevant to the prosecution's natural and probable consequences theory of aiding and abetting.

Appellant cites *People v. Hendrix* (2013) 214 Cal.App.4th 216 (*Hendrix*) to argue his May 2003 arrest and Pastore, Jr.'s shooting "lacked sufficient similarity to make the prior incident relevant to appellant's knowledge." When evidence of prior uncharged crimes is offered to prove issues such as identity, common design or plan, or intent, the prior offenses are admissible if the prior and current offenses "'are sufficiently similar to support a rational inference of identity, common design or plan, or intent.'" (*Foster, supra*, 50 Cal.4th at p. 1328.) The degree of similarity required depends on the fact to be proved: the least similarity is required to prove intent; greater similarity is required to show common design or plan; and the most similarity must be shown to prove identity. (*Ibid.*) If the prior conduct meets the applicable standard, the trial court must consider "whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)'" (*Ibid.*)

The court in *Hendrix* noted there was no authority on whether similarity is required to prove knowledge, so it concluded, "Whether similarity is required to prove knowledge and the degree of similarity required depends on the specific knowledge at issue and whether the prior experience tends to prove the knowledge defendant is said to

---

evidence of reputation, or evidence of specific instances of his or her conduct)" when that evidence is "offered to prove his or her conduct on a specified occasion." Subdivision (b) creates exceptions to that rule: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

have had in mind at the time of the crime." (*Hendrix, supra*, 214 Cal.App.4th at p. 241.) It explained that when the knowledge at issue is generalized, evidence of generally similar uncharged prior acts could be relevant. (*Ibid.*) It gave two examples: prior experiences involving driving under the influence could show knowledge of the dangers of driving under the influence; and prior drug convictions could show knowledge of the narcotic nature of a substance. (*Ibid.*)

Under the facts in *Hendrix*, the knowledge at issue was specific. The defendant was charged with knowingly resisting a police officer in the performance of his duty. In his defense, the defendant claimed he did not know the individual was a police officer and mistakenly believed the individual was a private security guard. (*Hendrix, supra,* 214 Cal.App.4th at pp. 237, 242-243.) The trial court admitted two prior encounters the defendant had with police officers to show the defendant's knowledge and rebut mistake of fact. (*Id.* at pp. 222, 225.) According to the Court of Appeal, "the admissibility of the uncharged offenses turns on whether the experiences defendant gained during those prior incidents prepared him to distinguish between security guards and the police. On this theory, the prior incidents would be probative if the circumstances under which defendant encountered the police on those prior occasions involved interaction with security guards." (*Id.* at p. 243.) Neither prior incident fulfilled these criteria, so they were not probative of the defendant's knowledge. (*Id.* at pp. 243-244.)

Unlike the specific scenario in *Hendrix*, the issue of appellant's knowledge here was general: whether appellant knew Arias was carrying a gun at the time of the shooting. Appellant could have learned Arias regularly carried a weapon in any number of prior circumstances that were only generally similar to the shooting. And even if some similarity was required, appellant's May 2003 arrest was sufficiently similar to be probative of appellant's knowledge because it involved appellant driving his car with Arias in the presence of firearms. Thus, appellant's May 2003 arrest tended to demonstrate appellant knew Arias was carrying a weapon at the time of the shooting.

The trial court also did not abuse its discretion in finding the probative value of the May 2003 arrest was not substantially outweighed by the risk of undue prejudice. As

21

explained, the evidence was highly probative of appellant's knowledge, and it was not particularly inflammatory, especially as compared to the charged murder. (*Foster, supra*, 50 Cal.4th at p. 1332.) The trial court also gave specific limiting instructions, which further ameliorated any potential prejudice. (*Ibid.*)

*D. Objection to Gang Experts/Ineffective Assistance of Counsel*

Appellant argues his trial counsel was ineffective in failing to object to the expert testimony from Detective Milchovich and Detective Lane on two points in response to the hypothetical questions posed to them: (1) their opinions that the driver of the car would know the passenger was armed; and (2) their opinions it was reasonably foreseeable that a shooting would occur under the circumstances. "'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.'" (*People v. Carter, supra*, 36 Cal.4th at p. 1189.) We conclude any objection to the experts' opinions would have been meritless, so appellant's counsel could not have been ineffective for failing to object. (*People v. Smithey* (1999) 20 Cal.4th 936, 992.)

An expert may testify to the culture and habits of criminal street gangs if those issues are relevant to the case. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944 (*Gonzalez*).) A gang expert may also give opinions in response to hypothetical questions that ask the expert to assume the truth of the underlying evidence. (*Id.* at p. 946; see *People v. Vang* (2011) 52 Cal.4th 1038, 1045 (*Vang*).)

Appellant argues the experts' opinions on whether someone in appellant's position would have known a fellow gang member was armed were irrelevant because the jury was capable of deciding whether appellant knew Arias was armed at the time of the shooting without the assistance of expert opinion. We disagree. The experts' opinions on when a gang member would know his fellow gang member is armed was ""sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."" (*Gonzalez, supra*, 38 Cal.4th at p. 944.)

22

Appellant also cites *People v. Killebrew* (2002) 103 Cal.App.4th 644 to argue, "Allowing the gang expert to offer an opinion that the driver of a car in such a situation would always know the passenger was armed, was the equivalent of allowing the expert to give an opinion on the appellant's guilt." Appellant similarly argues the experts improperly opined that a shooting was foreseeable and would likely occur under the circumstances. But *Killebrew* does not bar gang expert opinions in response to hypothetical questions mirroring the evidence in a case. Indeed, in *Vang* our Supreme Court "disapprove[d] of any interpretation of *Killebrew* . . . as barring, or even limiting, the use of hypothetical questions. Even if expert testimony regarding the defendants themselves is improper, the use of hypothetical questions is proper." (*Vang, supra*, 52 Cal.4th at p. 1048, fn. 3; see *Gonzalez, supra*, 38 Cal.4th at p. 947, fn. 3; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551.) Here, unlike in *Killebrew*, the experts testified only in response to hypothetical questions, not on whether appellant himself knew Arias had a gun or whether appellant knew a shooting would occur. Their testimony was therefore proper. (See *Gonzalez, supra*, 38 Cal.4th at p. 946.)

*E. Instruction on Natural and Probable Consequences Doctrine*

At trial, the court gave CALCRIM No. 403, the instruction on the natural and probable consequences doctrine. At the prosecutor's request and over appellant's objection, the court included the target offenses of attempted robbery and breach of the peace. Appellant challenges the inclusion of those target offenses in various respects, none of which is meritorious.

Appellant argues the trial court improperly included the target offense of breach of the peace because that offense allowed him to be convicted of murder based on "trivial" conduct. (See *People v. Prettyman* (1996) 14 Cal.4th 248, 269 (*Prettyman*) ["Murder, for instance, is *not* the 'natural and probable consequence' of 'trivial' activities."].) In finding the instruction appropriate, the trial court cited *People v. Medina* (2009) 46 Cal.4th 913 (*Medina*) and *People v. Montes* (1999) 74 Cal.App.4th 1050 (*Montes*). Appellant recognizes those cases approved murder and attempted murder convictions based on similar target offenses when the underlying confrontation is gang-related.

23

(*Medina, supra*, at pp. 922-923 [substantial evidence supported murder and attempted murder convictions as natural and probable consequences of simple assault because, among other facts, confrontation involved a gang challenge and gang expert testified a gang member challenging a rival would likely be armed and would be prepared to retaliate with violence]; *Montes, supra*, at p. 1055 [target offenses of simple assault and breach of the peace were more than "trivial" conduct supporting attempted murder conviction because confrontation arose in the context of a violent gang rivalry and involved threats and weapons].)  Appellant does not argue the facts of this case materially differ from those in *Montes* and *Medina*, so we find no error.

Appellant further contends breach of the peace cannot be a target offense supporting his murder conviction unless there is "clear evidence" he had "actual knowledge that the person he is aiding and abetting is armed with a firearm."  He is wrong on the law and the facts.  Courts have repeatedly rejected the argument that an aider and abettor in the gang context must know a fellow gang member was actually armed for the natural and probable consequences doctrine to apply.  (See, e.g., *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11; see *Medina, supra*, 46 Cal.4th at p. 924; *Montes, supra*, 74 Cal.App.4th at p. 1056.)  And even if that were required, appellant said during his interview with Detective Lane he saw Arias had a gun when Arias exited his car and he knew Arias had it because "[h]e sleeps with it; he walks around with it."

Finally, appellant contends the trial court should not have included attempted robbery as a target offense because substantial evidence did not support finding Arias attempted to rob Pastore, Jr.  A target offense must be included in a natural and probable consequences instruction when it "form[s] a part of the prosecution's theory of criminal liability and substantial evidence supports the theory."  (*Prettyman, supra*, 14 Cal.4th at pp. 266-267.)  To prove attempted robbery, the prosecution had to demonstrate Arias had "intended to take [someone else's] personal property from their presence by force or fear with the intent of permanently depriving them of that property and had taken a substantial step towards completing the robbery."  (*People v. Alexander* (2010) 49 Cal.4th 846, 919 (*Alexander*).)  Although thin, the evidence in this case was sufficient to support finding

24

Arias committed attempted robbery. In his interview with Detective Lane, appellant claimed Arias was going to rob someone, and Detective Milchovich testified one of the primary activities of Inglewood 13 was robbery, which supported an inference Arias intended to rob Pastore, Jr., when he approached him. Further, Arias had a three- to five-minute argument with Pastore, Jr., which the jury could have found constituted a substantial step toward robbing him. While Detective Lane testified there was no evidence Arias took anything from Pastore, Jr., *attempted* robbery did not require Arias to have done so. This evidence was sufficient to support attempted robbery as a target offense in the natural and probable consequences instruction.

### F. *Prosecutorial Misconduct/*Griffin *Error*

Appellant contends the prosecutor committed misconduct, which violated his constitutional rights pursuant to *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*), when she argued in closing rebuttal as follows:

"Then the biggest issue I have with counsel's argument is basically, and I believe this is what he is saying, that you jurors cannot believe what the defendant said during that interview [with Detective Lane] because, number 1, he was merely taking credit for a crime he didn't do, right? That's the gist of his argument. But if you recall, you've been told many times your decision has to be based on evidence. The burden of proof never shifts. It's always gonna be my burden. But the defense cannot just throw arguments at you without having any evidence to support it.

"I submit to you that this whole argument of how the defendant was merely taking credit for a crime he didn't do because two officers have seen it happen in the past, I mean that's basically the gist of his argument, that you cannot believe it because other officers have seen it happen. If it did happen, then why [*sic*] are the witnesses for that? Where is the evidence for that? Right? And counsel, the defense has the same subpoena powers as I do."

Appellant objected that the argument was inappropriate. At sidebar, the court overruled the objection, citing case law that the prosecution could argue the defense

25

failed to call logical witnesses or present evidence, but it may not suggest the defendant had a burden to produce witnesses or evidence.

The prosecutor resumed argument by clarifying, "It's what we call the failure to call logical witnesses. Yes, the defense has the same power to call witnesses and to present you with evidence to support arguments that they're making."

*Griffin* "protects a defendant's right not to have the prosecutor comment on his failure to testify. A prosecutor is permitted, however, to comment on a defendant's failure to introduce material evidence or call logical witnesses." (*Brown, supra*, 31 Cal.4th at p. 554.) "We apply a 'reasonable likelihood' standard for reviewing prosecutorial remarks, inquiring whether there is a reasonable likelihood that the jurors misconstrued or misapplied the words in question." (*People v. Roybal* (1998) 19 Cal.4th 481, 514.)

Here there was no reasonable likelihood the jury misconstrued the prosecutor's argument as a comment on appellant's failure to testify. Before appellant objected, the prosecutor's comments were confined exclusively to noting appellant did not introduce evidence to support his theory that his confession was false. To ensure no uncertainty remained, after the court overruled appellant's objection, the prosecutor clarified she was only commenting on appellant's failure to call logical witnesses and present evidence. Further, the court properly instructed the jury not to consider or discuss the fact that appellant did not testify.

G. *Voluntary Manslaughter Instruction*

Although not contemporaneously reported, appellant requested a voluntary manslaughter instruction during trial, which the court rejected. At the hearing on appellant's new trial motion, he renewed his argument that the instruction was warranted because there was a several-minute argument between Arias and Pastore, Jr., just before the shooting. The trial court explained it had previously rejected the instruction because it was not supported by substantial evidence, and it denied appellant's new trial motion for the same reason. Appellant contends this was error, but we disagree.

26

Voluntary manslaughter is a lesser included offense of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813 (*Thomas*).) "An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense." (*Ibid.*) "'On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense.'" (*People v. Avila* (2009) 46 Cal.4th 680, 705.)

"Voluntary manslaughter is 'the unlawful killing of a human being, without malice' 'upon a sudden quarrel or heat of passion.' (§ 192, subd. (a).) An unlawful killing is voluntary manslaughter only 'if the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an "'ordinary [person] of average disposition . . . to act rashly without due deliberation and reflection, and from this passion rather than from judgment.'" [Citations.]' [Citation.] 'The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation . . . must be affirmatively demonstrated.'" (*Thomas, supra*, 53 Cal.4th at p. 813.)

Appellant did not offer substantial evidence to justify a voluntary manslaughter instruction. He cites testimony from Pastore, Sr., that he heard a three- to five-minute argument between Arias and Pastore, Jr., before the shooting, and after the shooting, Arias jumped into appellant's car "all panicked." This is not substantial evidence that Arias acted in a heat of passion that obscured his judgment and negated his intent to kill. Even Pastore, Sr., did not initially think the argument was serious because he thought it was between his son and a neighbor and "they were playing or something like that." There was also no evidence Pastore, Jr., threatened Arias or Arias believed he had a weapon or was going to attack. The court did not err in refusing to give a voluntary manslaughter instruction.

H.  Cumulative Error

Because we find no error, we reject appellant's contention that reversal is required based on the cumulative effect of any errors.

**DISPOSITION**

Appellant's first degree murder conviction is reversed. If the People accept a reduction of the conviction to second degree murder, the trial court shall enter judgment for second degree murder and sentence appellant accordingly. Otherwise, the People may elect to retry appellant for first degree murder on a direct aiding and abetting theory.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.